JIMMY G. NIXON, SR., et al.,     :
                                 :     Civil Action No. 10-0546 (JBS)
          Plaintiffs,            :
                                 :
          v.                     :     **OPINION**
                                 :
DONNA ZICKEFOOSE, et al.,        :
                                 :
          Defendants.            :


**APPEARANCES:**

Plaintiffs pro se
Jimmy G. Nixon, Sr.
Luis Rodriguez
P.O. Box 2000
Fort Dix, NJ 08640

**SIMANDLE**, District Judge:

     Plaintiffs Jimmy G. Nixon, Sr., and Luis Rodriguez,
prisoners confined at the Federal Correctional Institution at
Fort Dix, New Jersey, seek to bring this civil action as
representative of a class of prisoners confined in Building 5703
from January 7, 2010 to January 27, 2010.

     By Opinion and Order [6, 7] entered February 22, 2010, this
Court administratively terminated this action for failure to pay
the filing fee or submit complete applications for leave to
proceed in forma pauperis.  In addition, the Court denied
Plaintiff Jimmy Nixon's application for leave to proceed as a
class representative.  Because Plaintiff Jimmy Nixon also had
three dismissals counting as "strikes" under 28 U.S.C. § 1915(g),
this Court held that Plaintiff Jimmy Nixon would not be permitted

to proceed without prepaying the $350 filing fee.  Plaintiff Luis
Rodriguez was granted leave to move to re-open within 30 days by
submitting either the $350 filing fee or a proper application for
leave to proceed in forma pauperis.

Thereafter, this Court received multiple applications.  This
matter has been re-opened to consider the Plaintiffs' various
applications and, if appropriate, to screen the Complaint.

After this Court administratively terminated this action, it
received the following submissions.  Plaintiff Luis Rodriguez
submitted a complete application for leave to proceed in forma
pauperis [9] and a letter request that this action proceed [10].
Plaintiff Jimmy Nixon, Jr., submitted a letter request [11, 12]
that he be permitted to rejoin this action on the grounds that he
is being retaliated against for filing the Complaint in this
matter.  In the letter, Plaintiff asserts a number of individual
claims regarding the alleged retaliation, including that he has
been put in the Special Housing Unit, his religious meal is being
delivered with the food all piled together, that he is being
denied exercise, that he has been told he must accept a third
person in his cell, etc.  Plaintiff alleges that he should be
permitted to proceed in forma pauperis because he is now in
imminent danger of serious physical injury as a result of the
alleged retaliation.  As evidence of this danger, Plaintiff
alleges that certain guards are verbally harassing him and

threatening to put a knife or shank in his property so that he
will be moved to a higher security institution.  Inmate Timothy
Prunick has moved for leave to join this class action.  Timothy
Prunick has not prepaid the filing fee nor submitted an
application for leave to proceed in forma pauperis.  Plaintiff
does not appear to be asking to act as a class representative.[1]

## I.  BACKGROUND

The following factual allegations are taken from PlaintiffS'
Complaint and are accepted as true for purposes of this review.

Plaintiffs allege that on or about January 7, 2010, a fire
alarm sounded, in response to which Defendant S. Okungbowa
ordered the inmates of Building 5703 outside.  Plaintiffs allege
that the inmates of building 5703 were outside in the snow and
cold weather for a period of two and one-half hours without
appropriate winter clothing.  Plaintiffs allege that, without
having a suspect for who pulled the fire alarm, the defendants
imposed punishment on the entire building including: no
recreation, no microwaves, no television, no telephone, no
visits, and no commissary "for several days" and the unit was
locked down and escorted to and from chow.  Plaintiffs also
allege that there was a denial of access to the law library and

---

[1] As this matter is dismissible on various grounds, the
request to join this purported class action will be denied
without prejudice.  To the extent Mr. Prunick seeks to proceed as
a class representative, he has failed to allege any facts
suggesting he would be an adequate class representative.

religious services, for an unspecified period of time. The
Complaint, however, is dated January 27, 2010, twenty days after
the fire alarm was pulled, so these sanctions are alleged to have
lasted no more than 20 days, as of the date the Complaint was
submitted. On April 2, 2010, Plaintiff Luis Rodriguez submitted
a letter indicating that "punishment," otherwise undescribed, was
still going on.

Plaintiffs also allege that the defendants found several
cell phones and chargers in the common area of Building 5703 and
used that event to sanction the unit of 378 inmates. Seventeen
more cell phones were found in Building 5703 while it was on
lockdown, a period of no more than 20 days, as of the date the
Complaint was submitted. Plaintiffs allege that Defendants
contend that the cell phones came into the prison over the fence.
In contrast, Plaintiffs allege that the cell phones must have
been brought in and sold by prison guards, to supplement their
pay, because more cell phones were found while the unit was on
lockdown.

Plaintiffs allege generally that the defendants tried to
manipulate and coerce inmates into providing information about
the cell phones and the fire alarm.

Plaintiffs allege that as a result of these events they are
suffering physical and mental pain and suffering. Plaintiffs
allege that these actions were taken to deprive the inmates,

described as African-Americans, Hispanic-Americans, and White-Americans, of the equal protection of the laws, and that they violated 42 U.S.C. § 1985.

The named defendants include Warden Donna Zickefoose, Captain Fitzgerald, Unit Manager Jennifer Knox, Associate Warden Hefron, Associate Warden Nichols, Associate Warden Nichols, Associate Warden Southland, Lieutenant Hall, Lieutenant Kenner, Counselor Battiste, Counselor R. Wiget, W. Beiderbeck, Prison Guard S. Okungbowa, Lieutenant Joyce Tucker, and John Does 1 through 650. Apart from the allegation that Defendant S. Okungbowa ordered the inmates outside when the fire alarm rang,[2] the only "factual" allegations against these defendants are that they "conspired" to deprive the Plaintiffs of their constitutional rights as described above. Plaintiffs seek compensatory and punitive damages and injunctive relief.

II. <u>STANDARDS FOR A SUA SPONTE DISMISSAL</u>

This Court must dismiss, at the earliest practicable time, certain <u>in forma pauperis</u> and prisoner actions that are frivolous, malicious, fail to state a claim, or seek monetary relief from a defendant who is immune from such relief. <u>See</u> 28 U.S.C. § 1915(e)(2) (<u>in forma pauperis</u> actions); 28 U.S.C. § 1915A (actions in which prisoner seeks redress from a

---

[2] With respect to Defendant Okungbowa, this Court cannot discern <u>any</u> constitutional violation arising out of evacuating prisoners in response to a fire alarm.

governmental defendant); 42 U.S.C. § 1997e (prisoner actions
brought with respect to prison conditions).

Moreover, no action may be brought by a prisoner with
respect to prison conditions unless the prisoner has exhausted
available administrative remedies.  42 U.S.C. § 1997e(a).
Specifically, 42 U.S.C. § 1997e(a) provides:

> No action shall be brought with respect to prison
> conditions under section 1983 of this title, or any
> other Federal law, by a prisoner confined in any jail,
> prison, or other correctional facility until such
> administrative remedies as are available are exhausted.

"[T]he ... exhaustion requirement applies to all inmate suits
about prison life, whether they involve general circumstances or
particular episodes, and whether they allege excessive force or
some other wrong."  Porter v. Nussle, 534 U.S. 516, 532 (2002)
(citation omitted).  Although failure to exhaust is an
affirmative defense which must be pled by the defendant, a
district court has inherent power to dismiss a complaint which
facially violates this bar to suit.  See Ray v. Kertes, 285 F.3d
287, 293 n.5 (3d Cir. 2002); Nyhuis v. Reno, 204 F.3d 65 (3d Cir.
2000).

The Third Circuit observed in Nyhuis, however, that an
inmate may satisfy § 1997e(a) through substantial compliance.
"Without embellishing - for the case law in the area will have to
develop - we note our understanding that compliance with the
administrative remedy scheme will be satisfactory if it is

substantial." <u>Nyhuis</u>, 204 F.3d at 77-8. <u>See also</u> <u>Veteto v.</u> <u>Miller</u>, 794 F.2d 98, 99-100 (3d Cir. 1986) (vacating <u>sua</u> <u>sponte</u> dismissal based upon failure to exhaust BOP's Administrative Remedy Program where prisoner alleged that he had "repeatedly requested administrative remedies" from the defendants with no response or success, and remanding to enable plaintiff "to amend his complaint so as to supply more specific facts on this subject and to enable the court to hold a preliminary hearing, if needed").

In determining the sufficiency of a <u>pro se</u> complaint, the Court must be mindful to construe it liberally in favor of the plaintiff. <u>Haines v. Kerner</u>, 404 U.S. 519, 520-21 (1972); <u>United States v. Day</u>, 969 F.2d 39, 42 (3d Cir. 1992). The Court must "accept as true all of the allegations in the complaint and all reasonable inferences that can be drawn therefrom, and view them in the light most favorable to the plaintiff." <u>Morse v. Lower Merion School Dist.</u>, 132 F.3d 902, 906 (3d Cir. 1997).

A complaint is frivolous if it "lacks an arguable basis either in law or in fact." <u>Neitzke v. Williams</u>, 490 U.S. 319, 325 (1989) (interpreting the predecessor of § 1915(e)(2), the former § 1915(d)). The standard for evaluating whether a complaint is "frivolous" is an objective one. <u>Deutsch v. United States</u>, 67 F.3d 1080, 1086-87 (3d Cir. 1995).

In addition, any complaint must comply with the pleading requirements of the Federal Rules of Civil Procedure.

Rule 8(a)(2) requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." A complaint must plead facts sufficient at least to "suggest" a basis for liability. <u>Spruill v. Gillis</u>, 372 F.3d 218, 236 n.12 (3d Cir. 2004). "Specific facts are not necessary; the statement need only 'give the defendant fair notice of what the ... claim is and the grounds upon which it rests.'" <u>Erickson v. Pardus</u>, 127 S.Ct. 2197, 2200 (2007) (citations omitted).

> While a complaint ... does not need detailed factual allegations, a plaintiff's obligation to provide the "grounds" of his "entitle[ment] to relief" requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do, <u>see</u> <u>Papasan v. Allain</u>, 478 U.S. 265, 286, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986) (on a motion to dismiss, courts "are not bound to accept as true a legal conclusion couched as a factual allegation"). Factual allegations must be enough to raise a right to relief above the speculative level ... .

<u>Bell Atlantic Corp. v. Twombly</u>, 127 S.Ct. 1955, 1964-65 (2007) (citations omitted).

The Supreme Court has demonstrated the application of these general standards to a Sherman Act conspiracy claim.

> In applying these general standards to a § 1 [conspiracy] claim, we hold that stating such a claim requires a complaint with enough factual matter (taken as true) to suggest that an agreement was made. Asking for plausible grounds to infer an agreement does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of

illegal agreement.  And, of course, a well-pleaded
complaint may proceed even if it strikes a savvy judge
that actual proof of those facts is improbable, and
"that a recovery is very remote and unlikely." ...  It
makes sense to say, therefore, that an allegation of
parallel conduct and a bare assertion of conspiracy
will not suffice.  Without more, parallel conduct does
not suggest conspiracy, and a conclusory allegation of
agreement at some unidentified point does not supply
facts adequate to show illegality.  Hence, when
allegations of parallel conduct are set out in order to
make a § 1 claim, they must be placed in a context that
raises a suggestion of a preceding agreement, not
merely parallel conduct that could just as well be
independent action.

     The need at the pleading stage for allegations
plausibly suggesting (not merely consistent with)
agreement reflects the threshold requirement of Rule
8(a)(2) that the "plain statement" possess enough heft
to "sho[w] that the pleader is entitled to relief."  A
statement of parallel conduct, even conduct consciously
undertaken, needs some setting suggesting the agreement
necessary to make out a § 1 claim; without that further
circumstance pointing toward a meeting of the minds, an
account of a defendant's commercial efforts stays in
neutral territory. ...

Twombly, 127 S.Ct. at 1965-66 (citations and footnotes omitted).

     The Court of Appeals for the Third Circuit has held, in the

context of a § 1983 civil rights action, that the Twombly

pleading standard applies outside the § 1 antitrust context in

which it was decided.  See Phillips v. County of Allegheny, 515

F.3d 224, 234 (3d Cir. 2008) ("we decline at this point to read

Twombly so narrowly as to limit its holding on plausibility to

the antitrust context").

     Context matters in notice pleading.  Fair notice under
Rule 8(a)(2) depends on the type of case -- some
complaints will require at least some factual
allegations to make out a "showing that the pleader is

> entitled to relief, in order to give the defendant fair
> notice of what the ... claim is and the grounds upon
> which it rests." Indeed, taking <u>Twombly</u> and the
> Court's contemporaneous opinion in <u>Erickson v. Pardus</u>,
> 127 S.Ct. 2197 (2007), together, we understand the
> Court to instruct that a situation may arise where, at
> some point, the factual detail in a complaint is so
> undeveloped that it does not provide a defendant the
> type of notice of claim which is contemplated by
> Rule 8. Put another way, in light of <u>Twombly</u>, Rule
> 8(a)(2) requires a "showing" rather than a blanket
> assertion of an entitlement to relief. We caution that
> without some factual allegation in the complaint, a
> claimant cannot satisfy the requirement that he or she
> provide not only "fair notice," but also the "grounds"
> on which the claim rests.

<u>Phillips</u>, 515 F.3d at 232 (citations omitted).

More recently, the Supreme Court has emphasized that, when assessing the sufficiency of <u>any</u> civil complaint, a court must distinguish factual contentions -- which allege behavior on the part of the defendant that, if true, would satisfy one or more elements of the claim asserted -- and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." <u>Ashcroft v. Iqbal</u>, 129 S.Ct. 1937, 1949 (2009). Although the Court must assume the veracity of the facts asserted in the complaint, it is "not bound to accept as true a legal conclusion couched as a factual allegation." <u>Id.</u> at 1950. Thus, "a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." <u>Id.</u>

> Therefore, after <u>Iqbal</u>, when presented with a
> motion to dismiss for failure to state a claim,
> district courts should conduct a two-part analysis.

10

First, the factual and legal elements of a claim should
be separated.  The District Court must accept all of
the complaint's well-pleaded facts as true, but may
disregard any legal conclusions.  Second, a District
Court must then determine whether the facts alleged in
the complaint are sufficient to show that the plaintiff
has a "plausible claim for relief."  In other words, a
complaint must do more than allege the plaintiff's
entitlement to relief.  A complaint has to "show" such
an entitlement with its facts.  See Phillips, 515 F.3d
at 234-35.  As the Supreme Court instructed in Iqbal,
"[w]here the well-pleaded facts do not permit the court
to infer more than the mere possibility of misconduct,
the complaint has alleged-but it has not
'show[n]'-'that the pleader is entitled to relief.'"
This "plausibility" determination will be "a
context-specific task that requires the reviewing court
to draw on its judicial experience and common sense."

Fowler v. UPMC Shadyside, 578 F.3d 203, 210-11 (3d Cir. 2009)

(citations omitted).[3]

Rule 10(b) of the Federal Rules of Civil Procedure provides:

A party must state its claims ... in numbered
paragraphs, each limited as far as practicable to a
single set of circumstances.  ...  If doing so would
promote clarity, each claim founded on a separate
transaction or occurrence ... must be stated in a
separate count or defense.

Rule 18(a) controls the joinder of claims.  In general, "[a]

party asserting a claim ... may join as independent or

alternative claims, as many claims as it has against an opposing

party."

_____

[3] The Court notes that the vague and generalized allegations
of "conspiracy" contained in the Complaint are not sufficient to
meet the notice pleading standards of Iqbal, Twombly, and
Phillips.  For this reason alone, the Complaint fails to state a
claim against any of the named defendants.

Rule 20(a)(2) controls the permissive joinder of defendants in pro se prisoner actions as well as other civil actions.

> Persons ... may be joined in one action as defendants if:
>       (A) any right to relief is asserted against them jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences; <u>and</u>
>       (B) any question of law or fact common to all defendants will arise in the action.

(emphasis added). <u>See</u>, <u>e.g.</u>, <u>Pruden v. SCI Camp Hill</u>, 252 Fed.Appx. 436 (3d Cir. 2007); <u>George v. Smith</u>, 507 F.3d 605 (7th Cir. 2007).

In actions involving multiple claims and multiple defendants, Rule 20 operates independently of Rule 18.

> Despite the broad language of rule 18(a), plaintiff may join multiple defendants in a single action only if plaintiff asserts at least one claim to relief against each of them that arises out of the same transaction or occurrence and presents questions of law or fact common to all. If the requirements for joinder of parties have been satisfied, however, Rule 18 may be invoked independently to permit plaintiff to join as many other claims as plaintiff has against the multiple defendants or any combination of them, even though the additional claims do not involve common questions of law or fact and arise from unrelated transactions.

7 Charles Alan Wright, Arthur R. Miller, and Mary Kay Kane, <u>Federal Practice and Procedure</u>, § 1655 (3d ed. 2009).

The requirements prescribed by Rule 20(a) are to be liberally construed in the interest of convenience and judicial economy. <u>Swan v. Ray</u>, 293 F.3d 1252, 1253 (11th Cir. 2002). However, the policy of liberal application of Rule 20 is not a

license to join unrelated claims and defendants in one lawsuit. See, e.g., Pruden v. SCI Camp Hill, 252 Fed.Appx. 436 (3d Cir. 2007); George v. Smith, 507 F.3d 605 (7th Cir. 2007); Coughlin v. Rogers, 130 F.3d 1348 (9th Cir. 1997).

Pursuant to Rule 21, misjoinder of parties is not a ground for dismissing an action. Instead, a court faced with a complaint improperly joining parties "may at any time, on just terms, add or drop a party. The court may also sever any claims against a party."

Where a complaint can be remedied by an amendment, a district court may not dismiss the complaint with prejudice, but must permit the amendment. Denton v. Hernandez, 504 U.S. 25, 34 (1992); Grayson v. Mayview State Hospital, 293 F.3d 103, 108 (3d Cir. 2002) (dismissal pursuant to 28 U.S.C. § 1915(e)(2)); Shane v. Fauver, 213 F.3d 113, 116-17 (3d Cir. 2000) (dismissal pursuant to 42 U.S.C. § 1997e(c)(1)); Urrutia v. Harrisburg County Police Dept., 91 F.3d 451, 453 (3d Cir. 1996).

### III. Bivens v. Six Unknown Agents

In Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388, 389 (1971), the Supreme Court held that a violation of the Fourth Amendment by a federal agent acting under color of his authority gives rise to a cause of action against that agent, individually, for damages. The Supreme Court has also implied damages remedies directly under the Eighth

Amendment, see Carlson v. Green, 446 U.S. 14 (1980), and under the equal protection component of the Fifth Amendment's Due Process Clause, see Davis v. Passman, 442 U.S. 228 (1979). But "the absence of statutory relief for a constitutional violation does not necessarily mean that courts should create a damages remedy against the officer responsible for the violation." Schreiber v. Mastrogiovanni, 214 F.3d 148, 152 (3d Cir. 2000) (citing Schweiker v. Chilicky, 487 U.S. 412 (1988). Relying upon Bivens, several lower federal courts have implied a damages cause of action against federal officers, under the Due Process Clause of the Fifth Amendment, for claims by federal pre-trial detainees alleging inadequate medical care or unconstitutional conditions of confinement. See, e.g., Lyons v. U.S. Marshals, 840 F.2d 202 (3d Cir. 1988); Magluta v. Samples, 375 F.3d 1269 (11th Cir. 2004); Loe v. Armistead, 582 F.2d 1291 (4th Cir. 1978), cert. denied, 446 U.S. 928 (1980).

The Supreme Court has not addressed whether supervisors in Bivens actions may be held liable on a theory of respondeat superior. Most courts to address the issue, however, have held that liability may not be based on respondeat superior. See, e.g., Ruiz Rivera v. Riley, 209 F.3d 24, 28 (1st Cir. 2000)(collecting cases); Laswell v. Brown, 683 F.2d 261, 268 & n.11 (8th Cir. 1982), cert. denied, 459 U.S. 1210 (1983) (basing its conclusion on the fact that the Supreme Court has looked to

42 U.S.C. § 1983 cases in evaluating the nature of defendant
officials' qualified immunity); Kite v. Kelly, 546 F.2d 334,
337-38 (10th Cir. 1976). See also Parker v. U.S., 197 Fed.Appx.
171, 173 n.1 (3d Cir. 2006) (not precedential); Balter v. U.S.,
172 Fed.Appx. 401, 403 (3d Cir. 2006) (not precedential). This
Court finds persuasive the reasoning of those courts that have
declined to impose respondeat superior liability in Bivens
actions. To the extent Plaintiffs' claims could be construed as
asserting liability based upon a theory of vicarious liability,
the Complaint fails to state a claim.

IV. ANALYSIS

A. Class Representation

Plaintiff Jimmy Nixon, Jr., asks this Court to "reinstate"
the class action, and to permit him to proceed in this action on
the grounds that he is now in imminent danger of serious physical
injury, see 28 U.S.C. § 1915(g), and he now seeks to assert a
myriad of individual claims arising out of alleged retaliation
and other events occurring after this Complaint was filed.

As noted in this Court's prior Opinion, pursuant to Rule
23(a) of the Federal Rules of Civil Procedure:

(a) One or more members of a class may sue or be sued
as representative parties on behalf of all members only
if:
(1) the class is so numerous that joinder of all
members is impracticable;
(2) there are questions of law or fact common to
the class;

>           (3)  the claims or defenses of the representative
>           parties are typical of the claims or defenses of
>           the class; and
>           (4)  the representative parties will fairly and
>           adequately protect the interests of the class.

(emphasis added).  "The requirements of Rule 23(a) are meant to
assure both that class action treatment is necessary and
efficient and that it is fair to the absentees under the
particular circumstances."  <u>Baby Neal by Kanter v. Casey</u>, 43 F.3d
48, 55, 30 Fed.R.Serv.3d 1469 (3d Cir. 1994).

     Nothing in Plaintiff Jimmy Nixon, Jr.'s, submissions
suggests that this Court erred in its previous decision that
Plaintiff Nixon would not be an adequate class representative.
Moreover, the fact that he now seeks to re-instate this class
action on the grounds of highly-individualized claims of
retaliation, <u>inter</u> <u>alia</u>, reinforces this Court's belief that
Plaintiff seeks to proceed as a class representative primarily to
litigate personal, rather than class, claims.  The Letter request
to re-instate Plaintiff as a class representative will be denied,
without prejudice to Plaintiff pursuing his individual claims in
an individual action.

     Plaintiff Luis Rodriguez also asks to proceed with this
class action.[4]  Plaintiff Rodriguez, however, has submitted no

---

[4] As Plaintiff Rodriguez has submitted a complete
application for leave to proceed <u>in</u> <u>forma</u> <u>pauperis</u>, this Court
will grant the application and order the Clerk of the Court to
file the Complaint.

support for his request to proceed as the sole representative of
the purported class of inmates confined to Building 5703.  He has
alleged no facts suggesting that he would "fairly and adequately"
protect the interests of the other purported class members.  To
the contrary, a review of the language of the Complaint suggests
that it would not be appropriate to permit Plaintiff Rodriguez,
as its co-author, to proceed as a class representative.  For
example, the Complaint is rife with conclusory allegations of
"conspiracy" and other scandalous and impertinent matter,
including a characterization of the alleged lockdown and
sanctions as kidnapping and false imprisonment.  (Complaint,
¶ 54.)

The Court notes that Plaintiffs have moved for appointment
of counsel; however, appointment of counsel is not a substitute
for adequacy of the class representative.[5]  This Court finds that
Luis Rodriguez would not be an adequate class representative.[6]

---

[5] Moreover, the Court notes that Plaintiffs have failed to
make any effort to address the factors set forth in <u>Tabron v.
Grace</u>, 6 F.3d 147 (3d Cir. 1993), <u>cert. denied</u>, 510 U.S. 1196
(1994), which sets forth the requirements for eligibility for
appointment of pro bono counsel.  Most importantly for present
purposes, the Plaintiffs have failed to submit a Complaint which
sets forth a claim sufficient to avoid dismissal.

[6] In addition to meeting the requirements of Rule 23(a), a
class action may be certified only if the requirements of Rule
23(b) are met.  Because the Complaint fails to state a claim,
this Court need not consider, at this time, whether Plaintiffs
can meet the requirements of Rule 23(b).

B.    Deprivation of Liberty Without Due Process

Construed liberally, the Complaint alleges that the lockdown constituted a deprivation of liberty without due process.

A liberty interest protected by the Due Process Clause may arise from either of two sources:  the Due Process Clause itself or State law.  See Hewitt v. Helms, 459 U.S. 460, 466 (1983); Asquith v. Department of Corrections, 186 F.3d 407, 409 (3d Cir. 1999).

With respect to convicted and sentenced prisoners, "[a]s long as the conditions or degree of confinement to which the prisoner is subjected is within the sentence imposed upon him and is not otherwise violative of the Constitution, the Due Process Clause does not in itself subject an inmate's treatment by prison authorities to judicial oversight."  Montanye v. Haymes, 427 U.S. 236, 242 (1976), quoted in Hewitt, 459 U.S. at 468 and Sandin v. Conner, 515 U.S. 472, 480 (1995).  Cf. Washington v. Harper, 494 U.S. 210, 221-22 (1990)(prisoner has liberty interest under the Due Process Clause in freedom from involuntary administration of psychotropic drugs); Vitek v. Jones, 445 U.S. 480, 493-94 (1980)(prisoner has liberty interest under the Due Process Clause in freedom from involuntary transfer to state mental hospital coupled with mandatory treatment for mental illness, a punishment carrying "stigmatizing consequences" and "qualitatively

different" from punishment characteristically suffered by one convicted of a crime).

"Discipline by prison officials in response to a wide range of misconduct falls within the expected parameters of the sentence imposed by a court of law." Sandin, 515 U.S. at 485 (upholding prisoner's sentence of 30 days' disciplinary segregation following a hearing at which he was not permitted to produce witnesses). See also Asquith, 186 F.3d at 410-11 (no liberty interest under the Due Process Clause in remaining in halfway house).

States, however, may confer on prisoners liberty interests that are protected by the Due Process Clause. "But these interests will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force, nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." Sandin, 515 U.S. at 484 (finding that disciplinary segregation conditions which effectively mirrored those of administrative segregation and protective custody were not "atypical and significant hardships" in which a state conceivably might create liberty interest). See also Asquith, 186 F.3d at 411-12 (return to prison from halfway house did not impose "atypical and significant hardship" on prisoner and, thus, did

not deprive him of protected liberty interest).  In <u>Griffin v.</u>
<u>Vaughn</u>, 112 F.3d 703, 708-09 (3d Cir. 1997), the Court of Appeals
for the Third Circuit held that a 15-month confinement in
administrative custody did not impose "atypical and significant
hardship," even in the face of state regulation requiring release
to the general population after 20 days in the absence of a
misconduct charge.  The Court of Appeals did note, however, that
if an inmate is committed to undesirable conditions for an
atypical period of time in violation of state law, that is a
factor to be considered in determining whether the prisoner has
been subjected to "atypical and significant hardship" triggering
due process protection.  <u>Id.</u>

        Here, the description of the lockdown, for a few weeks, in
response to the fire alarm and presence of multiple cell phones,
does not suggest that the inmates of Building 5703 were subjected
to "atypical and significant hardship."  The Complaint fails to
state a claim for deprivation of liberty without due process.

C.    <u>Denial of Access to Courts</u>

        Plaintiffs allege that they were deprived of access to the
law library and to the courts during the lockdown.

        The constitutional right of access to the courts is an
aspect of the First Amendment right to petition the government
for redress of grievances.  <u>Bill Johnson's Restaurants, Inc. v.</u>
<u>NLRB</u>, 461 U.S. 731, 741 (1983).  In addition, the constitutional

guarantee of due process of law has as a corollary the
requirement that prisoners be afforded access to the courts in
order to challenge unlawful convictions and to seek redress for
violations of their constitutional rights.  Procunier v.
Martinez, 416 U.S. 396, 419 (1974), overruled on other grounds,
Thornburgh v. Abbott, 490 U.S. 401, 413-14 (1989).  See also
Peterkin v. Jeffes, 855 F.2d 1021, 1036 n.18 (3d Cir. 1988)
(chronicling various constitutional sources of the right of
access to the courts).

In Bounds v. Smith, 430 U.S. 817, 828 (1977), the Supreme
Court held that "the fundamental constitutional right of access
to the courts requires prison authorities to assist inmates in
the preparation and filing of meaningful legal papers by
providing prisoners with adequate law libraries or adequate
assistance from persons trained in the law."  The right of access
to the courts is not, however, unlimited.  "The tools [that
Bounds] requires to be provided are those that the inmates need
in order to attack their sentences, directly or collaterally, and
in order to challenge the conditions of their confinement.
Impairment of any other litigating capacity is simply one of the
incidental (and perfectly constitutional) consequences of
conviction and incarceration."  Lewis v. Casey, 518 U.S. 343, 355
(1996) (emphasis in original).

There is no "abstract, freestanding right to a law library or legal assistance, [and] an inmate cannot establish relevant actual injury simply by establishing that his prison's law library or legal assistance program is subpar in some theoretical sense. ... [T]he inmate therefore must go one step further and demonstrate that the alleged shortcomings in the library or legal assistance program hindered his efforts to pursue a [non-frivolous] legal claim. He might show, for example, that a complaint he prepared was dismissed for failure to satisfy some technical requirement which, because of deficiencies in the prison's legal assistance facilities, he could not have known. Or that he had suffered arguably actionable harm that he wished to bring before the courts, but was so stymied by inadequacies of the law library that he was unable to file even a complaint." Lewis, 518 U.S. at 351.

In describing the scope of services which must be provided by the state to indigent prisoners, the Supreme Court has stated, "[i]t is indisputable that indigent inmates must be provided at state expense with paper and pen to draft legal documents, with notarial services to authenticate them, and with stamps to mail them. ... This is not to say that economic factors may not be considered, for example, in choosing the methods used to provide meaningful access. But the cost of protecting a constitutional right cannot justify its total denial." Bounds, 430 U.S. at 824-

25, <u>clarified on other grounds</u>, <u>Lewis v. Casey</u>, 518 U.S. 343. Thus, "there is no First Amendment right to subsidized mail or photocopying. [Instead], the inmates must point to evidence of actual or imminent interference with access to the courts." <u>Reynolds v. Wagner</u>, 128 F.3d 166, 183 (3d Cir. 1997).

In addition, one alternative for providing prisoners meaningful access to the courts is the provision of counsel. <u>See e.g.</u>, <u>Bounds</u>, 430 U.S. at 828 (approving the provision of "adequate assistance from persons trained in the law"); <u>Rauso v. Zimmerman</u>, 2006 WL 3717785, *4 (M.D. Pa. 2006) (collecting cases); <u>Pressley v. Johnson</u>, 2006 WL 2806572, *5 (W.D. Pa. 2006) (collecting cases).

Moreover, a prisoner alleging a violation of his right of access must show that prison officials caused him past or imminent "actual injury." <u>See</u> <u>Lewis</u>, 518 U.S. at 348-55 and n.3 (1996); <u>Oliver v. Fauver</u>, 118 F.3d 175, 177-78 (3d Cir. 1997).

Here, the Complaint fails to allege any actual injury. Plaintiffs have failed to describe even one legal action, of the type protected by the right of access to the courts, that was stymied by the lockdown. The Complaint fails to state a claim for denial of access to the courts.

Moreover, the Court notes that claims of denial of access to the Courts, dependent as they are on facts regarding individual legal actions, are generally inappropriate for class

certification unless Plaintiffs can assert an injury that applies to the class as a whole.

D.    Denial of Access to Religious Observations

Plaintiffs allege in a conclusory fashion that they were denied access to religious services.

The First Amendment to the U.S. Constitution, made applicable to the states by the Fourteenth Amendment, Cantwell v. Connecticut, 310 U.S. 296, 303 (1940), provides, inter alia, that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof... ." U.S. Const. amend. I. "Convicted prisoners do not forfeit all constitutional protections by reason of their conviction and confinement in prison," Bell v. Wolfish, 441 U.S. 520, 545 (1979), including the protections of the First Amendment and its directive that no law shall prohibit the free exercise of religion, O'Lone v. Estate of Shabazz, 482 U.S. 342, 348 (1987). "All prisoners must be afforded reasonable opportunities to 'exercise the religious freedom guaranteed by the First and Fourteenth Amendment.'" Small v. Lehman, 98 F.3d 762, 765 (3d Cir. 1996) (quoting Cruz v. Beto, 405 U.S. 319, 322 n.2 (1972)).

"The mere assertion of a religious belief does not automatically trigger First Amendment protections, however. To the contrary, only those beliefs which are both sincerely held and religious in nature are entitled to constitutional

protection." <u>DeHart v. Horn</u>, 227 F.3d 47, 51 (3d Cir. 2000).

<u>See also</u> <u>Sutton v. Rasheed</u>, 323 F.3d 236, 250-51 (3d Cir. 2003).

Once such a sincerely held religious belief is demonstrated, an inmate may establish that a prison regulation or practice violates the right to free exercise of religion by showing that it violates the "reasonableness test" set forth in <u>Turner v. Safley</u>, 482 U.S. 78, 89 (1987), and <u>O'Lone</u>, 482 U.S. at 349.[7] The standards delineated in <u>Turner</u> and <u>O'Lone</u> indicate that when a prison regulation or practice encroaches upon prisoners' rights to free exercise of their religion, the regulation is valid if it is reasonably related to a legitimate penological interest. <u>Turner</u>, 482 U.S. at 89; <u>O'Lone</u>, 482 U.S. at 349. The reasonableness standard involves the examination of the following four factors:  (1) whether the regulation or practice in question furthers a legitimate governmental interest unrelated to the suppression of expression; (2) whether there are alternative means of exercising First Amendment rights that remain open to prison inmates; (3) whether the right can be exercised only at

---

[7] More recently, in <u>Employment Division, Dept. of Human Resources v. Smith</u>, 494 U.S. 872, 878-79 (1990), the Supreme Court held that neutral laws of general applicability that incidentally impinge on religious practices do not violate the Free Exercise Clause.  No federal Court of Appeals has yet held that the <u>Smith</u> test supplants the <u>Turner</u> and <u>O'Lone</u> analysis in the prison context.  <u>See</u> <u>Levitan v. Ashcroft</u>, 281 F.3d 1313 (D.C. Cir. 2002) and cases cited therein.  <u>See also</u> <u>Fraise v. Terhune</u>, 283 F.3d 506, 515 n.5 (3d Cir. 2002) (acknowledging the issue, but declining to reach it in the absence of either party urging application of <u>Smith</u>).

the cost of less liberty and safety for guards and other
prisoners; and (4) whether an alternative exists which would
fully accommodate the prisoners' rights at de minimis cost to
valid penological interests.  Thornburgh v. Abbott, 490 U.S. 401,
415-18 (1989); Turner, 482 U.S. at 89-91.  However, prison
administrators need not choose the least restrictive means
possible in trying to further legitimate penological interests.
Thornburgh, 490 U.S. at 411.  Moreover, "[i]f the connection
between the regulation and the asserted goal is arbitrary or
irrational, [however,] then the regulation fails, irrespective of
whether the other factors tilt in its favor."  Shaw v. Murphy,
532 U.S. 223, 230-31 (2001).  Nevertheless, "the burden is not on
the state to prove the validity of the challenged prison
regulation but instead is on the inmate to disprove it."
Williams v. Morton, 343 F.3d 212, 217 (citing Overton v.
Bazzetta, 539 U.S. 126 (2003).

Here, Plaintiffs allege that they were placed in a short-
term lockdown as a result of the presence in their building of
numerous prohibited cell phones, which create a security risk for
prison inmates and personnel alike.  Based upon the facts alleged
in the Complaint, the temporary lockdown, with its attendant
short-term limitation on participation in prison religious
services, appears to be a rational reaction to a security threat.
Apart from these considerations, pertinent to factors (1) and (3)

of the Turner reasonableness analysis, Plaintiffs have failed to allege any facts that would assist this Court in applying Turner to their situation.  In light of the obvious security rationale for the lockdown, Plaintiffs must allege some facts suggesting that the limitation on attendance at religious services was not reasonable.  Plaintiffs fail to allege any facts describing other avenues available to them to practice their religions.  In the absence of such factual allegations, the Complaint fails to state a claim for denial of free exercise rights in violation of the First Amendment.

E.    Equal Protection Claim

Plaintiffs assert that the lockdown was imposed in violation of their constitutional right to equal protection.  They assert that the prisoners are a mix of African-American, Hispanic-American, and White-American inmates.  The Equal Protection claim is specious.

The Equal Protection Clause of the Fourteenth Amendment commands that no State shall "deny to any person within its jurisdiction the equal protection of the laws," which is essentially a direction that all persons similarly situated should be treated alike.  City of Cleburne, Texas v. Cleburne Living Center, 473 U.S. 432, 439 (1985) (citing Plyler v. Doe, 457 U.S. 202, 216 (1982); Artway v. Attorney General of New Jersey, 81 F.3d 1235, 1267 (3d Cir. 1996).  Despite its sweeping

language, though, "[t]he Equal Protection Clause does not forbid classifications.  It simply keeps governmental decisionmakers from treating differently persons who are in all relevant respects alike." Nordlinger v. Hahn, 505 U.S. 1, 10 (1992).

Proof of disparate impact alone, however, is not sufficient to succeed on an equal protection claim;  a plaintiff also must prove that the defendant intended to discriminate. Village of Arlington Heights v. Metropolitan Housing Development Corp., 429 U.S. 252, 264-66 (1977); Washington v. Davis, 426 U.S. 229, 242, 244-45 (1976).  Thus, discriminatory intent must be a motivating factor in the decision, but it need not be the sole motivating factor.  Village of Arlington Heights, 429 U.S. at 265-66.

Once this intentional disparity in treatment is shown, a court will proceed to determine whether the disparity can be justified under the requisite level of scrutiny.  See City of Cleburne, 473 U.S. at 439-40; Plyler v. Doe, 457 U.S. 202, 216-17 (1982); Price v. Cohen, 715 F.2d 87, 91-92 (3d Cir. 1983), cert. denied, 465 U.S. 1032 (1984) .  In testing the validity of state legislation or other official action that is alleged to deny equal protection, the "general rule is that legislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest." City of Cleburne, 473 U.S. at 439-40.  The general rule gives way, however, when a statute classifies by race,

alienage, or national origin; outside of the prison context,
these classifications "are subjected to strict scrutiny and will
be sustained only if they are suitably tailored to serve a
compelling state interest." Id. at 440.

The Equal Protection Clause protects prisoners from
arbitrary racial discrimination. Turner v. Safley, 482 U.S. 78,
84 (1987); Lee v. Washington, 390 U.S. 333 (1968). Nevertheless,
a court's review of prison policies and actions is tempered by
recognition that lawful incarceration necessarily limits many
privileges and rights and that courts are ill-equipped to deal
with many problems of prison administration. O'Lone v. Estate of
Shabazz, 482 U.S. 342, 348-49 (1987); Turner, 482 U.S. at 84-85
(1987). Thus, as noted above, an inmate's constitutional rights
are subject to restrictions that are "reasonably related to
legitimate penological interests." Turner, 482 U.S. at 89.

To determine the constitutionality of a prison policy, a
court must weigh the four Turner factors:

> "First, there must be a 'valid, rational connection'
> between the prison regulation and the legitimate
> governmental interest put forward to justify it," and
> this connection must not be "so remote as to render the
> policy arbitrary or irrational," Second, a court must
> consider whether inmates retain alternative means of
> exercising the circumscribed right. Third, a court
> must take into account the costs that accommodating the
> right would impose on other inmates, guards, and prison
> resources generally. And fourth, a court must consider
> whether there are alternatives to the regulation that
> "fully accommodate[] the prisoner's rights at de
> minimis cost to valid penological interests."

Waterman v. Farmer, 183 F.3d 208, 213 (3d Cir. 1999) (quoting

Turner, 482 U.S. at 89-91) (other internal citations omitted).

See also DeHart v. Horn, 227 F.3d 47, 51 (3d Cir. 2000). This

analysis applies to inmate equal protection claims. See DeHart,

227 F.3d at 61.

Here, the Complaint fails to delineate the purported

classification under challenge. Certainly, it is not a racial

classification, as the Complaint alleges that persons of diverse

racial and ethnic backgrounds are confined in Building 5703. The

only "classification" discernible from the Complaint is that the

inmates confined in Building 5703 were treated differently from

inmates confined in other buildings at the Federal Correctional

Institution at Fort Dix. The difference in treatment, however,

was a rational response to obvious security threats. The

Complaint fails to state a claim for violation of the Plaintiffs'

equal protection rights.

F.    42 U.S.C. § 1985

Plaintiffs allege that they were deprived of their rights

under 42 U.S.C. § 1985. Section 1985 provides, in relevant part:

(3) Depriving persons of rights or privileges

If two or more persons in any State or Territory
conspire ... for the purpose of depriving, either
directly or indirectly, any person or class of persons
of the equal protection of the laws, or of equal
privileges and immunities under the laws; ... the
person so injured or deprived may have an action for
the recovery of damages occasioned by such injury or

deprivation, against any one or more of the conspirators.

42 U.S.C. § 1985(3).  To state a claim under § 1985(3), one must allege:

> (1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States.

United Broth. of Carpenters and Joiners of America, Local 610, AFL-CIO v. Scott, 463 U.S. 825, 829 (1983).  With respect to the second element, the conspiracy must be motivated by "some racial, or perhaps otherwise class-based, invidiously discriminatory animus."  Griffin v. Breckenridge, 403 U.S. 88, 102 (1971).

Thus, in order to state a claim, there must be factual allegations suggesting some racial or otherwise invidiously discriminatory animus behind the alleged conspirators' actions.  See Kush v. Rutledge, 460 U.S. 719, 724-26 (1983).  No such allegations are set forth in the Complaint.

In addition, Plaintiff fails to allege any facts sufficient to set forth a claim of conspiracy.  See Ashcroft v. Iqbal, 129 S.Ct. 1937, 1949 (2009); Bell Atlantic Corp. v. Twombly, 127 S.Ct. 1955, 1964-66 (2007); Phillips v. County of Allegheny, 515 F.3d 224, 234 (3d Cir. 2008).  Here, Plaintiffs' conclusory allegation of "conspiracy" is devoid of any factual basis.  For

this reason, also, the Complaint fails to state a claim under § 1985(3). This claim will be dismissed.

## V. <u>CONCLUSION</u>

For the reasons set forth above, Plaintiffs will not be permitted to proceed as class representatives. The Complaint will be dismissed, pursuant to 28 U.S.C. §§ 1915(e)(2)(B)(ii) and 1915A(b)(1), for failure to state a claim.[8]

However, because it is conceivable that Plaintiffs may be able to overcome certain deficiencies noted herein, Plaintiff Luis Rodriguez will be permitted to submit an amended complaint asserting his <u>individual</u> claims and Plaintiffs Timothy Prunick and Jimmy G. Nixon, Sr., will be permitted to initiate their own <u>individual</u> actions asserting their <u>individual</u> claims.[9]

---

[8] The Court notes that "'[g]enerally, an order which dismisses a complaint without prejudice is neither final nor appealable because the deficiency may be corrected by the plaintiff without affecting the cause of action.' ... The dispositive inquiry is whether the district court's order finally resolved the case." <u>Martin v. Brown</u>, 63 F.3d 1252, 1257-58 (3d Cir. 1995) (quoting <u>Borelli v. City of Reading</u>, 532 F.2d 950, 951 (3d Cir. 1976)) (other citations omitted). In this case, if Plaintiff can correct the deficiencies of his Complaint, he may file a motion to re-open these claims in accordance with the court rules.

[9] Plaintiff Luis Rodriguez should note that when an amended complaint is filed, the original complaint no longer performs any function in the case and "cannot be utilized to cure defects in the amended [complaint], unless the relevant portion is specifically incorporated in the new [complaint]." 6 Wright, Miller & Kane, <u>Federal Practice and Procedure</u> § 1476 (2d ed. 1990) (footnotes omitted). An amended complaint may adopt some or all of the allegations in the original complaint, but the identification of the particular allegations to be adopted must

An appropriate order follows.

**s/ Jerome B. Simandle**
Jerome B. Simandle
United States District Judge

Dated:  **January 7, 2011**

---

be clear and explicit.  <u>Id.</u>  To avoid confusion, the safer course
is to file an amended complaint that is complete in itself.  <u>Id.</u>